IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Nathalie Doucet, | : | Case No. 1:05-cv-148 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | |
| | : | |
| University of Cincinnati, | : | ORDER GRANTING DEFENDANT'S |
| | : | MOTION FOR SUMMARY |
| Defendant. | : | JUDGMENT |
| | : | |

This matter comes before the Court on Defendant University of Cincinnati's Motion for

Summary Judgment.  (Doc. #10.)  For the reasons below, the Motion is **GRANTED**.

I.      **BACKGROUND**

Plaintiff and French national Nathalie Doucet sued the University of Cincinnati ("UC")

in March 2005, claiming she was subjected to national-origin employment discrimination and

retaliation for protesting that discrimination in violation of Title VII of the Civil Rights Act of

1964.  (Doc. #1.)  UC now moves for summary judgment on both Doucet's claims.

A.      **Factual Background**[1]

In September 2001, Doucet began working as an Assistant Professor in the UC School of

Design's Fashion Design Program.  (Doc. #10-6 at 3 ¶ 28; doc. #14 at 2 ¶ 28.)  Doucet was

initially appointed for a three-year term, with contract renewal contingent on her successful

completion of UC's faculty reappointment, promotion and tenure ("RPT") process.  (Doc. #10-6

at 2 ¶ 13, 3 ¶ 29-30; doc. #14 at 2 ¶¶ 13, 29-30.)  Doucet's appointment letter from UC stated

that this review process would be conducted during the spring of Doucet's second teaching year,

_____

[1] Except where noted or qualified, these facts are undisputed.

or spring 2003, but that Doucet was also expected to meet with the School of Design Director within three months of her appointment and annually thereafter "to review [her] prospective and actual performance, plans for continued professional growth, and RPT criteria and procedures." (Doc. #19 Ex. 1 at 1.)  It also stated that Doucet's "mix of teaching, research and service responsibilities" would be "arranged" between Doucet and the Director.  (Id. at 2.)

### 1.     School of Design RPT Review Process and Criteria

The RPT process begins with a faculty applicant's submission of a dossier of work to a committee within her school – in Doucet's case, the School of Design – which then issues a written recommendation on the application.  (Doc. #10-6 at 2 ¶¶ 14, 16; doc. #14 at 2 ¶¶ 14, 16.) Further reviews are conducted by School of Design Director Robert Probst; a college-level RPT committee; School of Design Dean Judith Koroscik, and UC's Provost.  (Doc. #10-6 at 1-2 ¶¶ 4, 7, 15; doc. #14 at 1-2 ¶¶ 4, 7, 15.)  While the Provost ordinarily makes the final decision on contract renewal and reappointment, applicants may request hearings before the University Faculty Grievance Committee ("UFGC"), which issues written recommendations to UC's President.  (Doc. #10-6 at 2-3 ¶ 15, 20-21; doc. #14 at 2 ¶¶ 15, 20-21.)  The UC President retains the discretion to reject UFGC's recommendations, however, and has testified that the grievance procedure is not an appropriate forum for attacking the more "qualitative aspects" of RPT reviews.  (See, e.g., Doc. #17 Ex. 2 (Deposition of UC President Nancy Zimpher) at 27; see also Doc. #19 Exs. 41, 43.)  UC faculty also receive annual performance reviews during their contract terms.  (Doc. #10-6 at 5 ¶ 42; doc. #15 at 3 ¶ 42.)

The School of Design's RPT criteria analyze faculty "performance in five distinct areas of activity," further defined as follows:

**1.      Teaching Effectiveness**

Teaching effectiveness is the ability to transfer concepts, to develop skills and to cultivate critical thinking and judgment.  Teaching effectiveness is demonstrated by improvement in a student's knowledge, skill and understanding.  The assessment of teaching effectiveness is provided by a combination of student and course evaluation[s], peer evaluations, and letters of recommendation by teaching colleagues, letters from previous students, and letters of recommendation by teaching colleagues, letters from previous students, and a review of student performance by the Chairperson and/or the School Director.  Advising and consulting with students is a required part of teaching effectiveness.

**2.      Scholarship and Research**

Scholarship and Research revolve around the pursuit of knowledge and understanding relevant to the fields of Art and Design.  Investigation or experimentation aimed at the discovery and interpretation of facts, revision of accepted theories or concepts in light of new facts, or practical application of such new or revised theories or concepts.

**3.      Creative Work/Professional**

Creative work is that work which defines, encloses or expands the field through the creation of artifacts and should be an extension of principle concern.  Faculty members may choose from among a variety of possibilities of professional involvement or practice as a means of consolidating a particular set of ideas.

**4.      Service**

The School of Design recognizes 6 potential areas of service:
- University
- College
- School
- Program
- Professional
- Community

Service to these 6 areas should involve not only the commitment of time and energy to the maintenance of existing or new programs, but also should entail a unique contribution which is related to a faculty member's knowledge, skills and experience.

(Declaration of Judith Korosick (hereinafter "Korosick Dec."), Doc. #10-2, Ex. G at 4.)  The criteria document lists, as examples of "recognized criteria" for "Research/Scholarship/Creative Activity," "Group show participation" and "Lectures."  (Id. at 6.)

While the criteria document clearly designates "teaching effectiveness" as the "primary focus" for faculty, it anticipates that "each faculty member will exhibit varying involvements

3

within the remaining areas" of activity and states that "[t]he degree of participation in these areas as well as the specific focus within each area is to be determined by the faculty member and should be a point of discussion in the annual review for non-tenured faculty." (Id. at 4-5.) The document cautions that "[a]n area as complex and sensitive as reappointment, promotion and tenure consideration cannot be specified so thoroughly that it includes every potential criteria variation" and that "[t]hese guidelines therefore present a general definition . . . which should be interpreted on an individual basis." (Id. at 4.) It further notes that "[t]erms such as *Scholarship, Creative* and *Professional* will understandably vary in interpretation and combination." (Id. at 5 (emphasis in original).)

### 2. Doucet's 2001-2002 and 2002-2003 Academic Performance Reviews

In September 2001, during Doucet's first quarter at UC, Doucet met with School of Design Director Probst and was told that the School's RPT criteria included evidence of satisfactory teaching and growth in one or more of the areas of scholarship and research, creative and professional work, and service. (Doc. #10-6 at 4 ¶¶ 32-33; doc. #14 at 2-3 ¶¶ 32-33; Deposition of Nathalie Doucet, January 18, 2006 (hereinafter "Doucet Dep.") at 38-39.) Doucet has testified that around this time, Probst became aware of her plans to organize a "Tandem Series" of "conversations" or exchanges between international fashion figures. (Doucet Dep. at 38-39; see also id., Ex. 7 at 2 (characterizing Series).)[2]

---

[2] Doucet now submits that she "indicated three areas of research" to Probst around the time of this initial. (Cf. Doc. #10-6 at 4 ¶ 34 and doc. #14 at 3 ¶ 34.) For support, she references the research summary she prepared for her annual review in *May 2002.* (See doc. #14 at 3 ¶ 34 (referencing Doc. #19 Ex. 7).

In April 2002, Doucet and Probst met again, this time in the company of Doucet's faculty mentor John Hancock, to discuss her research plans.  (Doc. #10-6 at 4 ¶¶ 36-37; doc. #14 at 3 ¶¶ 36-37.)  Hancock's written summary of that meeting, which Doucet reviewed, indicates that Probst told Doucet that the RPT criteria were really "rather loose and open, allowing faculty in these diverse disciplines to find their own way, and their own kind of interests, work, and effort." (Doucet Dep. at 41 and Ex. 6 at 1; doc. #10-6 at 4 ¶ 38; doc. #14 at 3 ¶ 38.)  The summary also indicates, however, that Probst told Doucet her "first priority in the School should be teaching and getting comfortable in the context of the [Fashion Design] Program, its mission and its faculty."  (Doucet Dep. Ex. 6 at 1.)  With respect to Doucet's research efforts, Hancock indicates that Probst told Doucet that certain "remarks made around the time of [her] hiring (about the interest in international connections and Parisian networks and so on) were sincere, although these connections are not enough in themselves; they need to be used to build up an area of expertise, activity, with outcomes for research and/or teaching."  (Id.)[3]  The summary also reflects that Probst attempted to clarify how Doucet's "international network [could] be used to produce real research; producing a series of articles and teaching content out of the issues and topics that are involved in the work of these famous people, and also eventually when there are funds, inviting them for visits at UC."  (Id. at 2.)

Hancock concluded his summary with the following observations:

---

[3] Hancock's summary of this portion of the meeting further notes, or speculates, that "[w]hat seemed like [Probst's] lack of support for the Tandem Series so far has been a lack of clarity about the processes of funding and administration that [Doucet wanted] to follow in making it happen" and that Probst would "definitely be open to providing administrative advice when there is a clear picture of how it may be externally funded."  (Id.)

5

> [A]fter we talk some more, there should be future meetings with [Probst],
> especially your annual review meetings, where you should expect to build, with
> [Probst's] help and approval, a specific "map" of future activities appropriate for
> tenure. . . . There needs to be a shared understanding very early about what
> combination of research, publication, entrepreneurship, networking outcomes, and
> so on (as well as teaching effectiveness), are best, in consideration of your skills
> and interests, and the expectations for the discipline of [Fashion Design].  (My
> other advice is still that we need to find out more about the [Fashion Design]
> expectations, associations, meetings, publications, and so on, that you should be
> aiming for; Robert couldn't help with that one, so who can?  We need clarity, in
> advance, about what will be understood as evidence of "leadership in the field" or
> a "contribution to the discourse".)

(Id.)

In late spring 2002, Doucet and Probst met a third time for Doucet's first annual review.
In the "Research/Creative/Professional Activity" section of her review paperwork, Doucet stated
that she was coordinating the United States' selection for the 2002 International Competition of
Young Fashion Designers of Paris; serving as president of a new "Arts of Fashion" nonprofit
foundation "to promote young international talents by organizing competitions, exhibitions,
meetings, debates"; and planning to launch a "Carte Blanche" series of exhibitions as well as the
aforementioned "Tandem Series."  (Doucet Dep., Ex. 7 at 2.)  She also stated that she had
applied for funding for two "sessions of trends and forecasting presentations" and obtained
funding or otherwise planned to attend several fashion conferences, festivals, and presentations.
(Id.)  In the "Service" section of her paperwork, Doucet stated that she had organized a business
meeting on behalf of the Department and "introduced" Department programs to several schools
in Paris; attended or served as committee members for fashion shows and competitions; escorted
a student and Department coordinator to shows, festivals, or studios; served as a guest speaker
for a trade course; and secured a donation for the Department.  (Id. at 3.)

6

Probst's remarks in the "Comments" section of Doucet's review paperwork read, in their entirety, as follows:

> Professor Doucet has gained familiarity with the program of Fashion Design and Product Development.  In her first year she has focused primarily on the development of syllabi and course structures.
> Efforts in the area of research/creative/professional activity have been initiated and seem promising.
> The coming academic year should be used to begin the development of a direction and a focus in the categories of Scholarship and Research, Creative Work and/or Professional Work in preparation for the first Reappointment Review.

(Id. at 4 ; see also doc. #10-6 at 5 ¶ 47, doc. #14 at 3 ¶ 47.)

In June 2003, Probst and Doucet met for Doucet's second annual review.  (See, e.g., Doucet Dep. Ex. 34 (review paperwork).)  Probst's written comments to this second review are far longer, and include the list of what he describes as "various issues related to [Doucet's] performance regarding next academic year."  (Id.)  The list includes the following comments:

• Research/Creative/Professional Activity:  Contributions to the body of knowledge in the discipline, demonstrated through publications, lectures, presentations, exhibitions. Recognized as an authority in the field through peer reviews.

• Service:  Academic committee participation on various levels is encouraged, programs, school, college, university. Plus in addition involvement in the professional community is desired, local, regional, national and international arenas.

(Id.)  Probst's list also includes a number of entries on coursework and advising, but those entries concern primarily curriculum and evaluation issues and do not directly criticize – let alone recommend any substantive changes to – Doucet's teaching style.  (Id.)

Doucet signed her review paperwork, but also attached a commentary protesting Probst's comments as devoid of any "guidance, supportive advice, or any positive suggestion in regard of Teaching, Research and Service."  (Id.)  She also complained that Probst's summary did not

7

accurately reflect "what was said and covered" at the meeting, and accordingly included her own account of events.  (Id.)

### 3. Other Concerns About Doucet's Research and Teaching Performance and Workload During Academic 2001-2002 and 2002-2003

UC suggests that from Doucet's first spring 2002 annual review forward, Probst had "concerns" about Doucet's research choices.  (Doc. #10-6 at 6 ¶ 50.)  Doucet objects to this characterization but does not dispute that in fall 2002, she emailed School of Design Dean Korosick to complain that she and Probst did not have "the same vision" about what her research should be.  (Doucet Dep. Ex. 10; see also doc. #10-6 at 6 ¶ 51 and doc. #14 at 3 ¶¶ 50-51.)

Doucet also admits that during both her first and second years of teaching at UC, School of Design administrators received or were otherwise made aware of a number of student concerns about her instructional style, grading policies and alleged favoritism.[4]  During Doucet's first quarter, in fall 2001, some of Doucet's students requested technical instruction from other faculty because Doucet did not provide it.  (Doc. #10-6 at 6 ¶ 52; doc. #14 at 3 ¶ 52.)  Also, in summer 2002, Director Probst and Fashion Design Program Coordinator Margaret Voelker-Ferrier responded to student concerns about "excessive workload" in a computer-aided design ("CAD") course taught by Doucet.  (Doc. #10-6 at 6 ¶ 55; doc. #10-2 at 2 ¶ 8, 3 ¶ 15; doc. # 14 at 4 ¶ 55.)

---

[4] UC references a number of student complaints about Doucet that it asserts are documented in "records kept by UC."  (See, e.g., doc. #10-2 at 2-3 ¶¶ 13, 14, 16, 18, 20 and referenced exhibits; doc. #10-6 at ¶¶ 53, 55-63.)  Doucet does not dispute that some of these complaints were made but does object to their admission, presumably on hearsay grounds.  (See, e.g., doc. #14 at ¶¶ 52-55, 57-59.)  For purposes of the present motion, the Court considers the student complaints not for the truth of their contents, but for their existence and reasonable effect on UC administrators.

Doucet attributes many of these concerns about her research and teaching to the failure of School of Design administrators, particularly Director Probst and Dean Korosick, to provide appropriate guidance and ensure that her teaching workload were reasonable in light of her abilities and the relative demands placed on other junior faculty.[5] With respect to guidance, Doucet suggests that Probst sent her "mixed messages" about the flexibility of the RPT criteria and failed to warn her, during either her first or second annual review, about the alleged teaching deficiencies later highlighted in her RPT review. (See, e.g., doc. #14 at 7-8 ¶¶ 5-6.) With respect to course assignments, Doucet suggests that Dean Korosick assigned Doucet CAD courses she knew Doucet was unqualified to teach, generating a number of particularly negative student evaluations that skewed Doucet's overall teaching scores for the academic years 2002-2003 and 2003-2004. (See discussion at Part I.A.6, infra; see also, e.g., doc. #14 at 8 ¶ 8, 9 ¶¶ 17-18, and Doc. #19 Exs. 54, 55, 57, 59.)

### 4. References to Doucet's French National Origin[6]

Doucet submits that during UC's spring 2002 academic quarter, Director Probst told her that her School of Design colleagues perceived her as "too French." (Doc. #14 at 7 ¶ 1 (citing Doucet Dep. at 50-51.) She further submits that in the fall 2003 academic quarter, Dean Korosick told her that her plans for an international fashion competition were "not the way Americans do it." (Doc. #14 at 7 ¶ 2 (citing Doucet Dep. at 131).) Doucet also suggests that

---

[5] As noted below, Doucet has also alleged that UC administrators were motivated by anti-French bias in expressing or responding to certain concerns about her professional performance.

[6] UC denies that UC administrators made the remarks referenced in this section, and contends that such remarks – even if made – are legally immaterial. (See doc. #1-1 at 3-4 ¶ 13; doc. #2 (at 3 ¶ 13; doc. #10 at 11-12.)

some outside individuals have made anti-French remarks that should be attributed to UC.  In her

complaint, Doucet alleged that a guest referee at a student fashion presentation told her that she

was "not speaking English."  (Doc. #1 at 4 ¶ 13.)  She has since suggested that UC

administrators may have been "impermissibly influenced" by a March 2003 email from a

student's parent that accused Doucet of being "very French and very anti-American" and arguing

that she should keep any anti-war sentiment to herself "while being paid with American dollars."

(Doc. #14 at 7 ¶ 3 (citing Doucet Dep. at 50).)

In general, Doucet has intimated that she was "out of the loop" within the School of

Design and that her colleagues at the School resented her for reasons including her national

origin.  (Doc. #14 at 7 ¶ 4 (citing Korosick Dep. at 61); see also doc. #1 at 4 ¶ 13.)  She does not

dispute, however, that at the time of her tenure the School of Design had an internationally

diverse teaching faculty that also included German, Swiss, Japanese, Korean, Australian and

Chinese nationals.  (Doc. #10-6 at 1 ¶ 5; doc. #14 at 1 ¶ 5.)  She also does not dispute that

Director Probst, the object of many of her allegations of national-origin bias, is a German

national of French descent.  (Doc. #10-6 at 1 ¶ 6; doc. #14 at 1 ¶ 6.)

### 5.    UC's Decision not to Renew Doucet's Teaching Contract

#### a.    RPT Process and Initial Recommendation Not to Renew Contract (Winter, Spring, and Early Summer 2003)

In February 2003, approximately a year and a half into her three-year contract term,

Doucet submitted a four-volume dossier for consideration by the School of Design's RPT

Committee.  (Doc. #10-6 at 7 ¶ 64; doc. #14 at 4 ¶ 64.)  Doucet's RPT dossier listed her research

as her organization of the Tandem Series; her coordination of the U.S. selection for the

international Arts of Fashion or "AF" Competition; her establishment of a foundation to fund her

10

work; a "Trends and Forecasting" presentation by an outside presenter during the Competition; and newspaper coverage of the Competition and her students' work. (Doc. #10-6 at 9 ¶ 71; doc. #14 at 4 ¶.71; see also Doucet Dep., Ex. 22, Self-Evaluation at 4.)[7] In the "self-evaluation" portion of the dossier, Doucet also discussed future plans to launch two other series, a "Carte Blanche" exhibition series and a "Cine Toiles" film series. (See Doucet Dep. Ex. 22, Self-Evaluation at 3.)

In addition to the materials submitted by Doucet, the Committee considered Doucet's student evaluations and several solicited and unsolicited letters of reference. (Doc. #10-6 at 7 ¶ 65, 9 ¶ 74; doc. #14 at 4 ¶¶ 65, 74.) Two of Doucet's fellow associate professors in the School of Design wrote unsolicited letters expressing concerns about Doucet's teaching abilities and recommending that her contract not be renewed. (Doc. #10-6 at 8 ¶¶ 67-68; doc. #14 at 4 ¶¶ 67-68; see also Doucet Dep. Exs. 17, 20.) A third professor, in a letter apparently *solicited* by Doucet, also recommended against renewal. (Doc. #10-6 at 8 ¶ 69; doc. #14 at 4 ¶ 69; see also Doucet Dep. Ex. 16.) At least one other design professor and a graduate student, however, wrote to the Committee to recommend renewal.[8] (See Doucet Dep. Exs. 14, 15.)

In March 2003, the Committee issued a letter recommending that Doucet not be reappointed as an Assistant Professor of Design. (Doc. #10-6 at 9 ¶ 75; doc. #14 at 5 ¶ 75; see also Doucet Dep. Ex. 23.) In an introductory section, the Committee noted that "School of Design Criteria for reappointment to the rank of Assistant Professor require 'demonstrated

---

[7] See also doc. #10-6 at 5 ¶ 46 (describing AF Competition).

[8] Two peers outside UC, the assistant curator of a French art museum and a fashion consultant and web editor, apparently also wrote letters. (See Doucet Dep. Ex. 22 at 8 and Ex. 29.)

11

evidence of satisfactory teaching, as well as growth in one or more of the other four areas of activity'," and found that Doucet had "not demonstrated clear evidence of satisfactory teaching" or "shown significant growth in other areas."  (Doucet Dep. Ex. 23 at 1.)  The Committee went on to discuss Doucet's performance in the areas of "Teaching Effectiveness," "Scholarship and Research," "Creative/Professional Work," and "Service."  (Id. at 1-3.)

Under the heading "Scholarship and Research," the Committee wrote that Doucet "has done little if any research," "seems not to understand the nature of research," and "has not shown any clear direction for further research pursuits."  (Id. 2.)  It reasoned that some of the activities Doucet had listed as research, including the AF Competition and Doucet's proposed lecture series, were more properly "regarded as professional or program service."  (Id.)  In its subsequent section on "Creative/Professional Work," the Committee stated that it did "not regard the activities in which Professor Doucet has been involved to constitute significant creative or professional work."  (Id.)  The Committee did credit Doucet's efforts under the heading of "Service," where it wrote that Doucet had "drawn on her international connections to begin development of a promising lecture series, which brought international attention to the Fashion Design program"; had "revitalized the American semi-final phase" of the AF Competition; and had "served on the Committee for the 2002 Fashion Show and Honors Night."  (Id. at 3.)

Approximately half of the Committee's letter is devoted to a discussion of "Teaching Effectiveness," as measured by Doucet's student evaluations – described as "ranging from very positive to very mixed" – and peer and other evaluations.  (See id. at 1-2.)  The Committee acknowledged that Doucet had earned consistently positive student feedback for her knowledge of European fashion and fashion history; and that "many" students appreciated her "helpfulness

12

with projects" and "attention to [their] progress" and her "challenging and demanding" style.
(Id. at 2.)  It further found, however, that Doucet appeared to have "recurrent difficulty planning
the workload in [her] courses" despite a "not excessive" courseload; that students had
"repeatedly expressed concerns about the clarity and consistency of her expectations"; and that
there were "recurrent concerns that [Doucet] lack[ed] the technical skills to be able to provide
students with sufficient instruction" in garment construction, sewing, and related software.  (Id.)
The Committee also questioned Doucet's self-described "professional" approach to pedagogy as
"at odds with the School of Design approach."  (Id.)  Finally, the Committee observed that
"advising and consulting with students is a required part of teaching effectiveness" under the
RPT guidelines, and that Doucet had "not yet met her advising responsibilities."  (Id.)

     The Committee's letter also criticized Doucet's RPT application itself.  It found that
Doucet had "chosen to use the self-evaluation portion of her application "as an improper venue
of criticism of fellow fashion design faculty, the fashion design program, and the
administration"; had included "extraneous and confusing material" in her dossier; and had
"missed an important opportunity to effectively present what she has done since her initial
appointment and what she proposed to do."  (Id. at 1; see also id. at 3 (describing remarks in self-
evaluation as "inappropriate").)

     The Committee concluded that, in its "considered and unanimous opinion," Doucet had
"not met the requirements of the School of Design criteria for reappointment to Assistant
Professor."  (Id.)  In late March 2003, Doucet wrote to the Committee to request reconsideration.
(Doc. #10-6 at 10 ¶ 77; doc. #14 at 5 ¶ 77; see also Doucet Dep. Ex. 25.)  Doucet acknowledged
that an RPT "dossier [was] not the appropriate place to raise issues of program structure and

function," but also emphasized that her expression of concerns "should not influence your decision on my reappointment since re-appointment is based strictly on whether I meet the published criteria." (Doucet Dep. Ex. 25 at 1.) She went on to argue that she had demonstrated satisfactory teaching performance, describing her student evaluations as "on average, quite positive" and questioning the grounds for the Committee's other criticisms of her teaching ability. (Id. at 2.) With respect to the Committee's evaluation of her putative research efforts, Doucet asked why, if the Committee did not regard those efforts as "scholarly work," Director Probst had "acknowledg[ed] it as scholarly work and suggest[ed] [she] move forward" during her annual performance review. (Id.) Doucet also suggested that to the extent such efforts were truly "service," the Committee should have recognized that service as "extensive" enough to satisfy the cited RPT requirement of "significant 'growth in one or more' of the other areas." (Id. at 3.)

Upon reconsideration of Doucet's dossier, the Committee unanimously reaffirmed its decision not to recommend reappointment. (Doc. #10-6 at 10 ¶ 78; doc. #14 at 5 ¶ 78; see also Doucet Dep. Ex. 28.) In its reconsideration letter, the Committee stated that it had "been guided only by the published RPT criteria throughout the review process" and had noted Doucet's criticisms in its initial letter "only with the intent of pointing out that [Doucet] had missed a crucial opportunity to focus her statement on her own accomplishments in teaching, research and service." (Doucet Dep. Ex. 28 at 1.) It also elaborated on its interpretation of "Scholarship and Research," observing that

> School of Design RPT criteria state that "scholarship and research revolve around the pursuit of knowledge and understanding relevant to the fields of Art and Design. Investigation or experimentation aimed at the discovery and

interpretation of facts, revision of accepted theories or concepts in the light of
new facts, or practical application of such new or revised theories or concepts."

(Id. at 2.)  The Committee took issue with Doucet's characterization of Probst's comments

during her first annual review, emphasizing that Probst did "not indicate that he endorsed

[Doucet's] understanding of research" and "in fact" had written that "[t]he coming academic

year should be used to begin the development of a direction and focus on the categories of

Scholarship and Reseach, Creative Work and/or Professional Work in preparation for the first

Reappointment Review."  (Id. at 3.)  The Committee also commented that "[o]ver half a year

later, there is nothing substantial" in Doucet's self-evaluation "regarding research and

publication, and nothing in the dossier clearly documenting her intentions in these areas."  (Id.)

With respect to "Service," the Committee acknowledged "a significant service commitment in

the AF Competition," but did "not consider the results of this effort sufficient to overcome the

weaknesses already noted in teaching and scholarship."  (Id.)

The Committee's recommendations and Doucet's dossier were then reviewed by School

of Design Director Probst, who issued a letter concurring with the non-reappointment

recommendation.  (Doc. #10-6 at ¶¶ 79-81; doc. #14 at 79-81; see also Doucet Dep. Ex. 29.)

With respect to research, Probst stated in part that "Doucet's efforts initiated a year ago seemed

initially promising but did not result in any work that would fit within our school's definition of

this category."  (Doucet Dep. Ex. 29.)  He further observed that there appeared to be "recurring

problematic issues" in Doucet's teaching and that her "most significant contribution to date was

in the category of service."  (Id.)  Doucet again wrote to request reconsideration of her

application, suggesting that her first annual review had not put her on notice of the School of

15

Design's true expectations for her teaching, research, and other pursuits.  (Doc. #10-6 at 10 ¶ 82; doc. #14 at 5 ¶ 82; see also Doucet Dep. Ex. 30.)

In May 2003, the RPT Committee of the UC College of Design, Architecture and Planning ("DAAP Committee") issued a letter concurring with the School of Design RPT Committee and Director Probst's recommendations not to renew Doucet's contract.  (Doc. #10-6 at 11 ¶ 84; doc. #14 at 5 ¶ 84; see also Doucet Dep. Ex. 31.)  The DAAP Committee wrote that while Doucet "has been active, it seems that much of her work is either tangential to or not adequately defined in terms of the specific criteria for School of Design faculty members." (Doucet Dep. Ex. 31 at 1.)  It described the student work included in her dossier as "quite good," but characterized her student evaluations as "uneven at best, even for a new instructor" and her advising as "neglected."  (Id.)  The DAAP Committee also observed that "[p]erhaps of greatest concern is that so few faculty colleagues have written positively about Professor Doucet's teaching, and a number have written negative letters."  (Id.)  The DAAP Committee also found that Doucet did not appear to "understand, communicate, or engage in scholarship as described in the School of Design criteria" and had "not developed a 'direction' or 'focus' for her scholarship and research or a pattern of activity that indicates scholarly accomplishment in the future is likely."  (Id. at 2.)  While the DAAP Committee did not criticize Doucet's efforts to organize the Tandem Series and AF Competition, it suggested that those projects "may have consumed too much of her attention and energy, such that her performance in most other areas suffered."  (Id.)

In June 2003, following the DAAP Committee's review, Doucet wrote a third letter challenging the recommendation against her reappointment.  (Doc. #10-6 at 11 ¶ 88; doc. #14 at

16

5 ¶ 88; see also Doucet Dep. Ex. 36.)  She argued that she had "never received any warning or comments or even advice concerning my teaching effectiveness" at her first annual review; that it appeared the School of Design's Director and Coordinator "were more than satisfied of my performance and contribution[s] to the School;" and that the Director had even described her "direction and focus" as "promising."  (Doucet Dep. Ex. 36 at 1.)  She also contended that the Committee had placed too much weight on her unsolicited negative reference and speculated that if her reappointment were ultimately denied, it would be because the School of Design had departed from its published RPT criteria and applied "others . . . unknown to me." (Id.)  She added that she had "the uncomfortable conviction that [her] nationality" was among those criteria, and alleged – as noted earlier – that Probst had described her as "too French."  (Id; see also Part I.A.4, supra.)

In June 2003, School of Design Dean Koroscik reviewed Doucet's dossier, the School of Design and DAAP RPT Committees' and Director Probst's recommendations and Doucet's correspondence challenging those recommendations and again found that Doucet should not be reappointed.  (Doc. #10-6 at 11 ¶ 89; doc. #14 at 5 ¶ 89; Doucet Dep. Ex. 37.)  Koroscik explained that while Doucet's student evaluations were arguably "positive for a first review," the "negative peer evaluations" appeared to provide both "convincing and disturbing" evidence of "shortcomings" in areas including course design and criteria, technical guidance and advising. (Doucet Dep. Ex. 37 at 1.)  Korosick went on to find "no evidence of activities or accomplishments in the areas of Research or Scholarship or Creative Work as defined in the school criteria."  (Id.)  She added that even classified "[a]s service," Doucet's work on the AF Competition and Tandem Series did "not demonstrate growth" and "ultimately did not serve the

17

college's best interests." (Id. at 2.) Korosick concluded that she could find "no basis on which to reverse the consistent recommendations" in Doucet's lower-level reviews. (Id. at 1.)

In July 2003, Doucet wrote to UC Provost Anthony Perzigian to request reconsideration of Korosick's negative reappointment recommendation. (Doucet Dep. Ex. 38.) Her request was unavailing; in August 2003, Perzigian issued a short letter denying reappointment. (Doc. #10-6 at 12 ¶ 92; doc. #14 at 5 ¶ 92; Doucet Dep. Ex. 39.) Perzigian again emphasized the School of Design's RPT criteria, which state "explicitly that teaching is the primary responsibility of each faculty member" and "teaching effectiveness" the "primary focus of each faculty member." He agreed with the lower-level assessments' findings that Doucet had "not achieved the necessary threshold of 'satisfactory teaching'." (Doucet Dep. Doc. 39.)

### b. Doucet's Internal Grievance and UC's Final Decision on Non-Renewal (Summer and Fall 2003)

In September 2003, Doucet filed a UFGC grievance against Perzigan, Korosick, Probst and the DAAP and School of Design RPT Committees, protesting non-renewal of her contract. (Doc. #10-6 at 12 ¶ 93; doc. #14 at 5 ¶ 93; see also Doucet Dep. Ex. 40.) Doucet complained that she did not receive adequate guidance and mentorship from Director Probst; that her courseload was unreasonably demanding relative to her colleagues'; that unsolicited reference letters were inappropriately included in her RPT dossier; that the School of Design's RPT criteria had been ignored or misapplied at various levels of her review; that she was denied an opportunity to respond to the DAAP Committee's recommendation; and that the review as a

18

whole was improperly influenced by consideration of her national origin.  (See, e.g., Doucet Dep. Ex. 40 at 7-8.)[9]

The UFGC held a hearing and issued a report finding that Doucet's contract "review process was tainted by procedural regularities" in a number of areas and recommending that Doucet's dossier be supplemented with additional "peer teaching evaluations" based on classroom observation and remanded to the School of Design RPT Committee for a new review. (Doucet Dep. Ex. 40 at 1, 3, 9.)  The UFGC found that Probst had given Doucet "mixed messages" about how to comply with the School of Design's RPT criteria and that the criteria were then "misapplied by the various levels of [RPT] review, particularly with regard to student evaluations" and "assessment of service, scholarship/research, creative work and professional activities."  (Id. at 7-8.)  It suggested that Doucet's student evaluations had been summarized in an excessively "negative" light and questioned the emphasis on "classifying . . . activities as service vs. research," noting that Doucet "need demonstrate only some activity in one of those areas" under the criteria.  (Id.)  The UFGC also took issue with Doucet's assignment to "teach a course she was unprepared for," although it did not find her courseload to be "inconsistent with that given other newly-hired tenure-track faculty."  (Id.)  It recommended that the RPT procedures on consideration of unsolicited letters should be "clarified," but suggested that the inclusion of those letters was not unduly prejudicial to Doucet because she was provided copies and allowed to respond.  (Id.)  The UFGC expressly *rejected* Doucet's allegations of national-

---

[9] Doucet also alleged that that the School of Design RPT Committee chairperson had not been elected in accordance with UC guidelines.  (See, e.g., id. at 8.)

origin bias, finding no "evidence that her national origin affected [her] consideration at any level of review."  (Id. at 8.)

In February 2004, UC President Nancy Zimpher issued a letter declining to follow the UFGC's recommendation to remand Doucet's dossier.  (Doc. #10-6 at 12 ¶¶ 98-99; doc. # 14 at 6 ¶¶ 98-99; Doucet Dep. Ex. 41.)  Zimpher disagreed that misapplication of the RPT criteria warranted remand, reasoning that the grievance procedures did not permit review of the "'weight or substantiality' of the reviewers' 'reasons, judgments, or substantial determinations.'" (Doucet Dep. Ex. 41 at 2.)  She found that many of the other issues identified by the UFGC, including inadequate mentoring, teaching workload and unsolicited letters, were also not proper subjects for a grievance review.  (Id. at 1-2.)  However, Zimpher agreed with the UFGC that Doucet had "failed to demonstrate that her national origin affected consideration of her application at any level of review."  (Id.)  In a letter asking Zimpher to reconsider aspects of her decision, the UFGC reiterated its "agreement about the question of national origin not being a factor in this case."  (Doucet Dep. Doc. #42 at 3.)

In March 2004, Zimpher reaffirmed her decision not to order a new RPT review of Doucet's application.  (Doucet Dep. Ex. 43.)  In this final decision letter, Zimpher emphasized that because "teaching is an absolute requirement for reappointment, it does not matter that a different categorization of the grievant's non-teaching activities might have allowed her to meet the requirements of one of the secondary categories."  (Id. at 3.)  For this and other reasons, Zimpher found there was "no basis for altering" the decision not to renew Doucet's UC contract.  (Id. at 4.)

### 6.    UC's Initiation of Disciplinary Proceedings and Other Developments During Doucet's Final (2003-2004) Academic Year

In August 2003, shortly before UC Provost Anthony Perzigan issued his RPT decision denying Doucet reappointment for the 2004-2005 academic year and Doucet filed her internal grievance protesting irregularities in the RPT process, Doucet became involved in a dispute with the School of Design administration over her course assignments for the upcoming semester. Doucet apparently emailed Program Director Voelker-Ferrier and School Director Probst to complain that she had been assigned to teach a new "Introduction to CAD" course for which she was unqualified only a month before the semester was set to begin.[10]  (See, e.g., doc. #19 Exs. 56-57.)  School of Design Dean Korosick then emailed Doucet to explain that the Introduction course had been designed as a "preparation for the CAD U4ia course that [Doucet] already taught," and to admonish Doucet for what Korosick characterized as "unfounded and inappropriate" "accusations of unfair treatment."  (Doc. #19 Ex. 56.)  Korosick also warned Doucet that if she continued to "communicate in this obstructionist way," Korosick would have to initiate a disciplinary proceeding.  (Id.)

Doucet responded with an email questioning Korosick's assessment of her ability to prepare for the CAD course, noting that CAD was not her specialty, that the RPT dossier characterized her past CAD teaching as "not good," and that the introductory course would be taught from a "new curriculum."  (Doc. #19 Ex. 57.)  Doucet also suggested that the School had treated her unfairly by assigning her a total weekly courseload of 18 teaching hours – against an apparent standard of 15 – and reassigning the teaching of a "Seminar in Merchandising" course

---

[10] Doucet also complained that her name had been omitted from an online course schedule apparently posted well before Doucet received her teaching assignments.  (Doc. #19 Exs. 54-55.) Dean Korosick later emailed Doucet to explain that Voelker-Ferrier had deferred her decision about whether to offer (and assign Doucet to teach) the Introduction to CAD course in anticipation of certain administrative decisions regarding "implementing the new curriculum."  (Doc. #19 Ex. 56.)

Doucet had created and taught the previous two falls to a graduate student.  (Id.)  She speculated that "maybe it is because I am a French citizen today and I should be punished for what I stand for which is the best in fashion design education for US students in our global world, even in Cincinnati[.]"  (Id.)  In a second email apparently sent in response to Korosick's reply to the above, Doucet reiterated her "strong doubts about fairness" at the School and stating "I can assure you that I will file a grievance if I have really to teach such a course in fall/winter."  (Doc. #19 Ex. #59 at 2.)  She also responded to Korosick's earlier criticisms of her "communication style":

> Maybe I should also remind you that I am French and therefore English is my second language, my culture is different and my sentences can't be as polished as an American one, but my concern is always to be accurate and founded with evidence . . . No rumor but facts.  But I hope that I improve myself in practicing so much with UC letters and emails about my written English style.

(Id. (ellipsis in original).)

In mid-October 2003, Korosick initiated an academic disciplinary proceeding against Doucet.  (See, e.g., doc. #14 at 9 ¶ 19; doc. #19 Exs. 56, 62; see also Deposition of Judith Korosick (hereinafter Korosick Dep.), doc. #15 at 121-26, 132-49.)  In her letter notifying Doucet, Korosick alleged that Doucet was not teaching the assigned course content[11] in her fall 2003 introduction to CAD course, acknowledged that she and Doucet were "currently in mediation because of [Doucet's] unhappiness at receiving this assignment," and declared that she was removing Doucet as instructor "effective immediately."  (Doc. #19 Ex. 62.)  Korosick also alleged that Doucet was "teaching the same content in two different required courses"

---

[11] At her deposition, Korosick testified that all but four students who had enrolled in the fall 2003 Introduction to CAD dropped the course after Doucet suggested that she was not qualified for and would not be teaching the assigned content.  (Korosick Dep. at 126-27.)

involving the same group of students; had "created a hostile environment for students" by "placing them in the middle of [her] conflict with other faculty members"; and had "demeaned students" by emailing their personal information to other students, faculty, and administrators. (Id.)  Korosick described these allegations as "consistent with a pattern of behavior that has been called to your attention many times over the course of the past two years. . . ."  (Id.)  Korosick apparently concluded her investigation of the charges in December 2003, but it is unclear from the submitted evidence whether any formal findings were made or discipline imposed pursuant to that investigation.  (See, e.g., Korosick Dep. at 132-49.)

Although Doucet's teaching contract ran through September 1, 2004, she apparently did not teach during either the summer 2003 or summer 2004 quarters.  (See, e.g., doc. #82 Ex. 82.) School Director Probst's May 2004 email informing Doucet that the School would "not require [her] services" that summer does not explain the refusal to assign Doucet courses, other than to state that "neither the contract nor University Rules guarantee summer teaching to faculty."  (Id.)

### 7.    UC's Reappointment of Other School of Design Junior Faculty[12]

In the same academic year Doucet applied for and was denied reappointment, at least two junior faculty within the School of Design, Injoo Kim and Margaret Schroeder, were reappointed.  (See, e.g., Korosick Dec. Exs. F, G.)  It is undisputed that at the time, school

---

[12] While Doucet admits the facts set forth below, she also objects to them as immaterial by reference to other evidence indicating that the RPT procedures envision faculty being compared "against RPT criteria, not each other."  (Doc. #14, p. 6 ¶¶ 107 et seq.)  The Court finds that these facts are material, at least for purposes of its *prima facie* discrimination analysis.  As discussed below, in order to raise an inference of discrimination, Doucet must show – among other things – that UC favored "similarly situated" faculty members.  See Part III.A.2.a, infra.  Doucet herself submits that Kim and Schroeder are "similarly situated" to her, although she disputes that all of the facts set forth here are material to that comparison for Title VII purposes.  Id.

administrators had received no student complaints about either Kim or Schroeder.  (Doc. #10-6 at 14 ¶ 113; doc. #14 at 6 ¶ 113.)  It is also undisputed that no other design faculty had expressed concerns about Kim or Schroeder's student interactions, technical abilities, grading policies or coursework requirements.  (Doc. #10-6 at 14 ¶ 114; doc. #14 at 6 ¶ 114.)  Both Kim and Schroeder had their contracts renewed after being unanimously recommended for reappointment at all levels of RPT review.  (Doc. #10-6 at 14 ¶ 119; doc. #14 at 7 ¶ 119; Korosick Dec. Ex. G at 2-15, Ex. F at 2-9.)

### a.    Professor Injoo Kim

In academic year 2003-2004, Professor Injoo Kim was in her fourth teaching year and second appointment at UC.  (Doc. #10-6 at 13 ¶ 106; doc. #14 at 6 ¶ 106.)  At the time, Kim's research projects included authoring and publishing a book on apparel-making and developing an instructional book and CD-ROM on machine knitting.  (Doc. #10-6 at 13 ¶ 108; doc. #14 at 6 ¶ 108.)  The self-evaluation portion of Kim's 2003 RPT dossier listed a number of other past and present projects, including several pending and published research papers, articles and handbooks and a long list of proceedings, presentations, lectures and workshops.  (Korosick Dec. Ex. G at 19-21.)  Like Doucet's, Kim's dossier included both solicited and unsolicited letters of reference.  (See Korosick Dec. at 4 ¶ 21 and Ex. G at 30-41.)  All of Kim's letters were positive, however; none recommended against her reappointment.  (Id.; doc. #10-6 at 13 ¶ 109; doc. #14 at 6 ¶ 109.)

The School of Design RPT Committee unanimously recommended reappointment of Kim, finding that she "had matured into a highly effective and productive teacher since her last reappointment" and was "consistently ranked by students as Superior and Good."  (Korosick

Dec. Ex. G at 13-14.)  It was strongly complementary of Kim's research efforts, noting that she had recently authored and presented two papers in addition to developing her books and CD-ROM.  (Id.)  Finally, the Committee found that Kim had performed "important and far-reaching service" by participating on the International Textile and Apparel Association's Aesthetic's Committee, obtaining software grants, and chairing faculty committees.  (Id.)  The DAAP RPT Committee also unanimously recommended reappointment, noting that Kim's teaching evaluations "consistently show her teaching to be in the Good to Superior range" and citing positive reviews from Kim's reference letters.  (Id. at 9.)

The DAAP Committee found that Kim had been "very productive" in her research and scholarly work and had demonstrated a "healthy commitment" to service through student advising and participation on fashion industry and school boards.  (Id.)  School of Design Director Probst also supported reappointment, describing Kim as a "superb educator" and noting that her instructional books had been "adopted by many fashion design programs as a standard." (Id. at 11.)  In her final letter recommending reappointment, Dean Korosick echoed the observations of the School and DAAP RPT Committees and Director Probst and found that Kim had shown "clear 'patterns of growth' in teaching, research and service with 'significant achievements' in scholarship already in evidence."  (Id. at 7-8.)

### b. Professor Margaret Schroeder

Like Doucet, Professor Margaret Schroeder was in her first UC teaching appointment when she began her 2003 RPT review.  At the time, she was actively conducting research on the history of rag rug weaving in Ohio and its connection to sustainable design.  (Doc. #10-6 at 14 ¶ 112; doc. #14 at 6 ¶112.)  The self-evaluation portion of Schroeder's dossier lists some

"professional awards" and service and other "activities," but no books, recent academic articles, or other presentations akin to Kim's.  (Korosick Dec. Ex. F at 10-12.)  It is undisputed, however, that at the time of her RPT application Schroeder had uniformly positive reference letters – both solicited and unsolicited – and had received consistently positive evaluations from her UC School of Design students.  (Doc. #10-6 at 13 ¶ 111; doc. #14 at 6 ¶ 111; see also Korosick Dec. Ex F at 20-22.)

In recommending Schroeder's reappointment, the School of Design RPT Committee found that she had "excelled in teaching" and "effectively and diligently" advised students; conducted research in a "relevant and heretofore undocumented area"; and taken on "great responsibility" in the service arena.  (Korosick Dec. Ex. F at 9.)  In his concurrence, Director Probst noted that Schroeder's teaching evaluations were "very positive and have consistently improved"; that she had "identified a [research] focus" in an undocumented area with a connection to the "broad and global issue" of sustainable design; and that she had a "respectable record" of service inside and beyond UC.  (Id. at 6-7.)  The DAAP RPT Committee expanded on these observations, finding that a virtual majority of Schroeder's student evaluations were "good" or "superior" from the very start of her teaching career and that her second-year evaluations showed a "marked improvement to an already good record"; that Schroeder had identified a research "focus" and "framework" around rag rug design; and had demonstrated service commitments "at an appropriate level for a first appointment."  (Id. at 4-5.)

In a final letter recommending Schroeder's reappointment to the UC Provost, Dean Korosick found that Schroeder had exceeded the "competence and mastery" in teaching necessary for an initial review; had "made the initial steps towards establishing a research

agenda"; and had undertaken service commitments that – while "focused on her academic unit" – went "beyond the expected committee work." (Id. at 2.) Korosick concluded that Schroeder had shown "clear 'patterns of growth' in teaching, research and service" that satisfied the RPT criteria and supported reappointment. (Id.)

### B.    Procedural Background

In June 2004, at the end of UC's academic year and a few months before her initial contract was due to expire, Doucet filed a Charge of Discrimination form with the Equal Employment Opportunity Commission ("EEOC"). (Doc. #10-6 at 3 ¶ 29, 13 ¶¶ 103-104; doc. #14 at 2 ¶ 29, 6 ¶¶ 103-104; see also doc. #1-2 Ex. A (charge).) On her EEOC charge form, Doucet checked the box corresponding to "Cause of Discrimination Based on National Origin" but left other boxes, including the box corresponding to "Cause of Discrimination Based on Retaliation," blank. (Doc. #1-2 Ex. A.) On a one page-attachment to the EEOC form, Doucet wrote:

> On August 25, 2003, I was notified by the [UC] Provost that my contract would not be renewed because I had not achieved the necessary threshold of "satisfactory teaching." I filed a grievance with the [UFGC] which determined that my rights as a faculty member had been violated and recommended that my reappointment be reconsidered. The President of the University, Nancy Zimpher, rejected the recommendation of the UFGC. . . . . I believe I have been subjected to discrimination on the basis of my national origin: French. Throughout the course of my employment at the University of Cincinnati, I was subjected to hostility, criticism, isolation, and disparate treatment due to cultural differences and recent general resentment against France and French citizens.

(Doc. #1-2 at 2.) Doucet also attached a four-page sworn affidavit with more detail on her core allegation that she "was denied reappointment and the opportunity to teach courses during the summer of 2004 for reasons attributable to [her] national origin: French." (Doc. #19 Ex. 45; see also doc. #13 at 19.) That affidavit states in part that

> After I filed my grievance to the UFGC I was informed by the Dean that I was under investigation for alleged misconduct in connection with a computer related course I had been directed to teach.  In fact, I had protested that assignment because I was not trained in computers and did not feel I was an appropriate choice to teach the course.  I was then removed from the course and a disciplinary action was lodged against me by the Dean.  Ultimately the University withdrew the charges but only after I had demanded a hearing on the merits.

(Doc. #19 Ex. 45 at 4.)  The affidavit concludes:

> Throughout the course of my employment at [UC] I was subjected to criticism, hostility based on my national origin and different treatment in the terms and conditions of my employment, such a [sic] consideration for reappointment and teaching assignments.  Colleagues and other faculty who are not French nationals but who were otherwise similarly situated to me as members of the faculty were routinely treated more favorably and did not have their contracts non-renewed.

(Id. at 4.)

In November 2004, the EEOC notified Doucet that it had decided not to further pursue her charge.  (Doc. ##10-6 at 13 ¶ 105; doc. #14 at 6 ¶ 105.)  Doucet filed her civil complaint in this Court in March 2005, alleging that UC's actions had violated her Title VII rights to be free from both (1) "discrimination on account of national origin in the terms, conditions and opportunities of her employment" and (2) "acts of retaliation for opposing acts of discrimination or other protected activity under Title VII."  (Doc. #1 at 6.)  In April 2006, UC moved for summary judgment on both of Doucet's claims.  (Doc. #10.)

## II.    JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over Doucet's claims pursuant to 28 U.S.C. § 1331.  Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the moving party has the burden of showing that there exists no genuine issue of material fact, and

the evidence, together with all inferences that can permissibly be drawn from that evidence, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

## III.    ANALYSIS

Doucet alleges that UC violated Title VII by discriminating against her "on account of national origin" in the "terms, conditions, and opportunities of her employment" and then retaliating against her for "opposing" that discrimination. (Doc. #1 at 6.) For the reasons below, the Court concludes that UC is entitled to summary judgment on both counts of Doucet's complaint.

### A.    Discrimination Claim (Count One)

Title VII, 42 U.S.C. § 2000e et seq., makes it illegal for any covered[13] employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or *national origin*, or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or *national origin*.

_____

[13] UC does dispute that it is a covered employer.

42 U.S.C. §§ 2000e-2 (a) (1), (2) (emphasis added).  To survive summary judgment on her discrimination claim, Doucet must either show some direct evidence that UC discriminated against her on the basis of her French nationality or make out a *prima facie* discrimination case based on circumstantial evidence.  See, e.g., Johnson v. Kroger Co., 319 F.3d 858, 864-66 (6th Cir. 2003).  For the reasons below, the Court finds that Doucet has failed to create a genuine issue of material fact as to whether UC subjected her to unlawful national origin discrimination on either a direct-evidence or *prima facie* theory, and therefore **GRANTS** summary judgment to UC on Doucet's discrimination claim.

### 1.    Direct Evidence of National Origin Discrimination

In its opening memorandum on summary judgment, UC contends that Doucet cannot prevail on a direct-evidence theory of discrimination because she has alleged only a handful of "ambiguous, isolated, and remote" remarks that – even if they occurred and could be construed as "anti-French" – are not reasonably related to UC's decision not to renew Doucet's contract. (Doc. #10 at 13-14.)  Doucet appears to concede these points in her responsive memorandum, which argues only that she should survive summary judgment on a circumstantial or *prima facie* theory.  (See doc. #13 at 12-13.)  Because Doucet appears to have abandoned any claim to relief based on a direct evidence theory, the Court proceeds directly to Doucet's *prima facie* Title VII discrimination case.  See, e.g., Bradley v. Mary Rutan Hosp. Assoc., 322 F. Supp. 2d 926, 931 n.7 (S.D. Ohio 2004); Kattar v. Three Rivers Area Hosp. Auth., 52 F. Supp.2d 789, 798 n. 7 (W.D. Mich. 1999); Jones v. Allercare, 203 F.R.D. 290, 307 n. 8 (N.D. Ohio 2001).

### 2.    *Prima Facie* Case of National Origin Discrimination

To state a *prima facie* case of national origin discrimination, Doucet must at least show that (1) she was a member of a group protected under Title VII and (2) was "similarly situated" in all "relevant respects" to an employee outside the protected group who received more favorable treatment. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998); see also Mitchell v. Toledo Hosp., 964 F.2d 577, 582-83 (6th Cir. 1992) (citing in part McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Doucet's *prima facie* burden is not onerous; to prevail, she must simply produce enough circumstantial evidence "to create an inference" of discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 263 (1981); Talley v. Bravo Pitno Rest., 61 F.3d 1241, 1246 (6th Cir. 1995) (citing Shah v. General Elec. Co., 816 F.2d 264, 268 (6th Cir. 1987)). Once Doucet satisfies this standard, the burden shifts to UC to articulate some legitimate, non-discriminatory reason for its adverse treatment of the plaintiff. See, e.g., Burdine, 450 U.S. at 254-55. If UC does so, Doucet may survive summary judgment only by showing that UC's preferred reason is in fact a pretext for discrimination. Id. at 255-56.

UC contends that Doucet cannot make out a *prima facie* Title VII case of national origin discrimination because she was not "similarly situated" to Injoo Kim and Margaret Schroeder, the fellow fashion design professors she alleges UC favored with reappointment. (Doc. #10 at 15-16.) UC further contends that – even assuming Kim and Schroeder *were* "similarly situated" to Doucet and that Doucet can therefore make a *prima facie* showing of discrimination – UC's RPT process revealed legitimate, nondiscriminatory reasons for favoring those individuals that Doucet cannot rebut as pretextual. (Id. at 16-19.) Doucet responds that UC reads the "similarly situated" test too narrowly and also fails to identify any "objective criteria" which distinguished

31

her from Kim and Schroeder for purposes of their respective contract renewals. (Doc. #13 at 14-15.) She reasons by extension that UC cannot offer its application of RPT – a process she alleges was "tainted by irregularities and motivated by bias" – as a legitimate, nondiscriminatory reason for denying her reappointment. (Id. at 16.)

### a.    Faculty "Similarly Situated" to Doucet

To be "similarly situated" to Doucet, her fellow faculty members must have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct[,] without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell, 964 F.2d at 583 (internal citations omitted). They need not be "identically situated to [Doucet] in every aspect of their employment," but must be similarly situated "in all *relevant* respects." Ercegovich, 154 F.3d at 353 (emphasis in original).

Doucet contends that Kim and Schroeder were "similarly situated" to her because they were faculty members of the same UC department and were subject to identical performance, evaluation and promotion rules and procedures. (Doc. #13 at 14.) UC submits that this analysis is incomplete and that Kim and Schroeder were in fact not "similarly situated" to Doucet, because the record reveals that there were other "relevant aspects" of the professors' employment – such as their "teaching evaluations and research and service activities" – in which Doucet materially underperformed her colleagues. (See, e.g., doc. #18 at 1-2.)

UC's position is well taken, although it is better construed as arising under the next prong of the Title VII *prima facie* analysis. Under Doucet's formulation of "similarly situated," the mere fact that some employees from a larger group with a common job description, supervisor,

32

and set of performance and promotion rules were fired while others were retained would be sufficient to raise a presumption that the fired employees were subject to unlawful discrimination. As <u>Mitchell</u> makes clear, however, there may be "differentiating or mitigating circumstances" that distinguish *otherwise* similarly situated employees and justify employers' differential treatment of those employees. <u>Mitchell</u> (emphasis added), 964 F.2d at 583. In other words, even if the record establishes that a plaintiff was "similarly situated" to better-treated colleagues in all relevant respects of her employment, a defendant may "rebut [a] presumption of discrimination" against that plaintiff "by producing evidence that the plaintiff was rejected, or someone else preferred, for a legitimate, nondiscriminatory reason." <u>Burdine</u>, 450 U.S. at 254. Therefore, even *assuming arguendo* that Doucet, Kim and Schroeder were "similarly situated" for Title VII purposes as Doucet contends, UC may prevail on summary judgment if it produces – and Doucet fails to rebut as pretextual – legitimate, nondiscriminatory reasons for its decision to renew Kim's and Schroeder's teaching contracts but not renew Doucet's. The Court now examines those reasons.

### b. Legitimate, Nondiscriminatory, Non-Pretextual Reason for UC's Denial of Reappointment to Doucet

To articulate a legitimate, nondiscriminatory reason for favoring Kim and Schroeder over Doucet, UC must "clearly set forth, through the introduction of admissible evidence, the reasons for its rejection" of Doucet's application for reappointment. <u>Burdine</u>, 450 U.S. at 254-55. Once UC has done so, Doucet cannot survive summary judgment by cursorily dismissing UC's stated reasons as "pretext." <u>Id</u>. at 255-56. Rather, Doucet must point to evidence suggesting that UC's proferred nondiscriminatory rationale is "unworthy of credence" or that the employer was "more likely motivated" by unlawful discrimination. <u>Id</u>. at 256. In the Sixth Circuit, a plaintiff may

33

establish pretext by showing that the employer's rationale either (1) had no basis in fact; (2) were insufficient to motivate the employer; or (3) did not actually motivate the employer.  See, e.g., Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

UC submits that Doucet was not reappointed because she "faile[d] to satisfy the School of Design's RPT criteria" in teaching and other areas.  (See doc. #10 at 16.)  This proferred rationale clearly constitutes a legitimate, nondiscriminatory reason for denying Doucet reappointment, and thus satisfies UC's burden under the second prong of the *prima facie* test. Doucet contends, however, that the RPT criteria amount to nothing more than pretext in the circumstances of her case because the criteria are inherently subjective and were "ignored or misapplied" to her for discriminatory reasons.  (Doc. #13 at 15.)  The Court finds, however, that even when the record is construed in the light most favorable to Doucet, no reasonable jury could conclude that UC's reliance on the RPT criteria to deny Doucet reappointment was pretextual.

It is undisputed that the School of Design's written RPT criteria describe "teaching effectiveness" as a "primary focus" of faculty performance, and that Doucet was advised early in her tenure that the criteria required her to show, at a minimum, "evidence of satisfactory teaching."  (See discussion and citations at Part I.A.1 and 2, supra.)  Doucet admits that during her first two years at the School, the administration received a number of student complaints about her teaching style and instructional policies.  (See supra Part I.A.3.)  Doucet was also the target of a number of "fair," "poor," and "inferior" student evaluations and two unsolicited letters from colleagues questioning her teaching abilities.  (Doc. #19 Ex. 53; Part I.A.5.a, supra.) Doucet's RPT reviewers repeatedly referenced these issues in concluding that Doucet had not

34

shown sufficient evidence of satisfactory teaching to qualify for reappointment.  (See Part
I.A.5.a, supra.)  While the record does not include teaching evaluations for Kim and Schroeder,
Doucet does not contend that their evaluations were comparable to – let alone worse – than hers.
Nor does she dispute that at the time of the RPT review, the School of Design's administration
had not received any complaints about Kim or Schroeder from either students or fellow design
faculty.  (See Part I.A.7, supra.)

A reasonable jury construing the facts above could only conclude that – whatever
subjectivity may have existed in the application of the secondary research, service, and
professional criteria – UC legitimately distinguished between Doucet, Kim and Schroeder on the
basis of the primary and threshold RPT criterion of demonstrated teaching effectiveness.  While
Doucet contends that UC's application of the RPT criteria was distorted by discriminatory bias
and thus pretextual, the circumstantial evidence on this point is insufficient to lead any
reasonable jury to so conclude.  Significantly, although the University Faculty Grievance
Committee concluded that Doucet's RPT review had been "tainted by procedural irregularities,"
it found no evidence of national-origin bias.  See Part I.A.5.b., supra.  Nor has Doucet pointed to
other evidence that could support a reasonable inference that the alleged irregularities were
driven by national-origin bias.[14]  For instance, while Doucet suggests that her student evaluation

_____

[14] While the record strongly suggests that *Doucet* regarded her RPT process as tainted by
national-origin bias, there is virtually no evidence on this point other than Doucet's deposition and
emails, letters, and other documents authored by Doucet.  To the extent other record documents refer
– even obliquely – to Doucet's nationality, they suggest that Doucet's nationality made her a *more*
attractive candidate for reappointment than she would otherwise have been.  See, e.g., Part I.A.2
(discussion of Doucet's "international connections and Parisian networks" as a potential source of
teaching, research, and/or service material) and Part I.A.5.a (approving discussion, in RPT review
documents, of Doucet's use of her "international connections to begin development of a promising
lecture series"), supra.  There is no evidence that School administrators were in any way influenced

scores were artificially depressed by the inclusion of at least one CAD course she regarded herself as unqualified to teach,[15] there is no indication that national-origin bias – as opposed to resource or other legitimate considerations – motivated the School's course assignments.  Doucet has fallen short of establishing any genuine issue of material fact as to whether the criteria had no basis in fact, were insufficient to motivate UC, or did not actually motivate UC in its decision not to reappoint her.  See Manzer, 29 F.3d at 1084.

In sum, because Doucet has failed to establish a genuine dispute of material fact sufficient to support either a direct-evidence or *prima facie* case of national-origin discrimination, the Court **GRANTS** summary judgment to UC on the first count of Doucet's complaint.

### B.      Retaliation Claim (Count 2)

Employers covered by Title VII may not "discriminate against" an employee who has "opposed" any other practice – including national origin discrimination – the Title forbids.  See 18 U.S.C. § 2000e-3(a).  Doucet alleges that UC violated Title VII not only by discriminating against her on the basis of her French origin during the RPT process, but also by retaliating against her for opposing that discrimination by lodging a complaint with the University Faculty Grievance Committee ("UFGC") that alleged her RPT process had been biased.  (See doc. #1 at 6 and doc. #13 at 18-19.)  She observes that approximately a month "after she filed a [UFGC]

---

by a student parent's expression of anti-French bias, and no corroboration for Doucet's allegations that School administrators – some of whom were also European nationals – personally expressed similar biases.  See Part I.A.4, supra.

[15] See discussion and citations at Part I.A.3, supra.

grievance" in September 2003, "she was subjected to a disciplinary proceeding which was ultimately withdrawn." (Doc. #13 at 19; see also Part I.A.6, supra (describing proceeding initiated by School of Design Dean Korosick in October 2003 and concluded in December 2003).) UC asserts that Doucet's retaliation claim is not properly before this Court, because it arose before the filing of her June 2004 EEOC charge but was not properly included in that charge.[16] (See, e.g., doc. #18 at 7-8.) UC also asserts that even if Doucet's retaliation claim is properly before the Court, it is entitled to summary judgment on the merits of that claim because Doucet has not linked her filing of the UFGC grievance to any subsequent conduct by UC that would qualify as retaliatory under Title VII. (See, e.g., id. at 8-10.)

### 1.     Inclusion of Retaliation in EEOC Charge

This Court lacks jurisdiction over Title VII claims not previously raised in a charge filed with the EEOC or "reasonably . . . expected to grow out of" such a charge, except where they arise from conduct that occurs after the relevant EEOC filing. Strouss v. Mich. Dept. of Corrections, 250 F.3d 336, 342 (6th Cir. 2001); Albeita v. Transamerica Mailings, Inc., 159 F.2d 246, 254 (6th Cir. 1988), A plaintiff who experiences allegedly retaliatory conduct before filing her EEOC charge, but "neither check[s] the retaliation box nor describe[s] anything that indicates that she might have a retaliation claim" in that charge, may therefore be barred from claiming retaliation in any subsequent civil suit. Albeita, 159 F.2d at 254; see also Ang v.

---

[16] Doucet's original contract with UC did not expire until September 1, 2004, approximately three months after she filed her EEOC charge. (See doc. #10-6 at 3 ¶¶ 28-29, 13 ¶ 104; doc. #14 at 2 ¶¶ 28-29, 6 ¶ 104.) It is therefore conceivable that Doucet experienced some retaliation that postdated her EEOC filing. However, Doucet has not alleged any specific instances of retaliation in this June to September 2004 interval.

Procter & Gamble Co., 932 F.2d 540, 546-47 (6th Cir. 1991) (plaintiff who failed to check retaliation box or "refer to retaliation in the factual statement" barred from alleging retaliation).

UC notes that Doucet did not check the "Retaliation" box on her EEOC charge form and also did not explicitly mention "retaliation" in the attachment to the form in which she described her claims.  (Doc. #10 at 17-18.)  Doucet responds that her retaliation claim could nonetheless be "reasonably expected to grow out of" her EEOC charge, because she referred to her UFGC grievance in her attachment to the charge form and submitted a supporting affidavit indicating that she had been "subjected to a disciplinary proceeding."  (Doc. #13 at 18-19.)  Doucet also contends that because this Court is obliged to "constru[e] Title VII liberally," it must read her EEOC charge broadly enough to encompass a retaliation allegation.  (Doc. #13 at 19.)  UC observes however, that the allegations in an EEOC charge need not be liberally construed where a plaintiff was represented by counsel at the time of her EEOC filing.[17]  Ang, 932 F.2d at 546-47.

While this is admittedly a close question, the Court is persuaded that Doucet's EEOC charge and attachments should be construed to state – and thus preserve for purposes of the present suit – a retaliation claim against UC.  While it is true that the *word* "retaliation" does not appear anywhere in Doucet's EEOC papers, both Doucet's one-page attachment to the EEOC form and her accompanying four-page affidavit clearly describe facts that – in substance – could give rise to such a claim.  See generally discussion and citations at Part I.B, supra.  In her attachment, Doucet stated that she had filed a UFGC grievance after being notified by the UC

---

[17] The record suggests that Doucet was assisted by counsel in preparing her EEOC filing, and Doucet has not contended otherwise.  (See, e.g., doc. #1-2 Ex. B (EEOC charge form bearing notary stamp of Doucet's current counsel).)

Provost that her contract would not be renewed.  (See doc. #1-2 at 2.)  In her supplemental affidavit, Doucet included the following narrative:

> After I filed my grievance to the UFGC I was informed by the Dean that I was under investigation for alleged misconduct in connection with a computer related course I had been directed to teach.  In fact, I had protested that assignment because I was not trained in computers and did not feel I was an appropriate choice to teach the course.  I was then removed from the course and a disciplinary action was lodged against me by the Dean.  Ultimately the University withdrew the charges but only after I had demanded a hearing on the merits.

(Doc. #19 Ex. 45 at 4.)  This passage, considered in the context of Doucet's entire EEOC submission, could be construed to assert that UC's asserted reasons for initiating the disciplinary action – the dispute over the course assignment – were incomplete or pretextual, and that the action was in fact inspired by Doucet's earlier decision to grieve her contract non-renewal on grounds including national origin discrimination.  Doucet's case is thus distinguishable from those in which a Title VII plaintiff left the "retaliation" box on her EEOC form unchecked and also failed to "*describe anything* that indicate[d] she might have a retaliation claim" in her attachments to the form.  Albeita, 159 F.3d at 254 (emphasis added); see also Ang, 932 F.2d at 546 (emphasis added) (barring retaliation claim where factual statement submitted with EEOC charge "*did not refer* to retaliation. . . .").  To the extent UC is entitled to summary judgment on Doucet's retaliation claim, it must be because that claim necessarily fails on the merits.

## 2.    Merits of Retaliation Claim

Where there is no direct evidence of retaliation, Title VII retaliation claims are analyzed according to the same burden-shifting framework as discrimination claims.[18]  See, e.g., Weigel v.

---

[18] Doucet references both the direct and *prima facie* retaliation tests in her opposition, but does not argue that there is any direct evidence of retaliation.  (See doc. #13 at 19-21.)

Baptist Hosp. of East Tenn. 302 F.3d 367, 381-82 (6th Cir. 2002).  To state a *prima facie* Title

VII retaliation case, Doucet must show that (1) she engaged in a protected activity; (2) she

suffered an adverse employment action; and (3) a causal link existed between the protected

activity and the adverse action.  Id. at 381.  Once Doucet states a *prima facie* case, the burden

shifts to UC to articulate a legitimate, non-retaliatory reason for its adverse action, which Doucet

must then rebut as pretextual.  See, e.g., id.

UC contends that Doucet cannot satisfy the causation prong of a *prima facie* retaliation

case, because there is "no evidence of a causal connection" between her UFGC grievance filing

and any adverse employment action.  (Doc. #18 at 8-9.)  In the alternative, UC argues that

Doucet cannot demonstrate that UC's legitimate, nondiscriminatory reasons for any adverse

treatment amounted to a mere pretext for retaliation.  (Doc. #10 at 21.)  For the reasons below,

the Court agrees that Doucet has failed to establish a genuine dispute of material fact as to

whether she was retaliated against in violation of Title VII, and accordingly **GRANTS** summary

judgment to UC on the second and final count of Doucet's complaint.

### a.  *Prima Facie* Causal Connection Between Filing of UFGC Grievance and Adverse, Allegedly Retaliatory Actions

UC first contends that there is simply no evidence that Doucet's September 2003 filing of

a UFGC grievance alleging national origin discrimination in her RPT review triggered

retaliation.  It notes that the School of Design RPT Committee, School Director Probst and the

DAAP RPT Committee had already recommended against Doucet's reappointment by the time

Doucet filed her UFGC grievance.  (Doc. #10 at 18-19.)  It also asserts that Doucet has failed to

identify any specific evidence that Dean Korosick's or UC President Nancy Zimpher's decisions

not to order any further review were retaliatory.  (Id.)

Doucet suggests that the Court may infer retaliation from the fact that she "complained of what she perceived to be a discriminatory bias on the basis of her national origin during both the RPT process and [in] the UFGC grievance," only to have UC administrators affirm her contract non-renewal without adopting the UFGC's recommendation for further review.  (Doc. #13 at 20.)  Doucet also asserts that she was subjected to retaliation outside the RPT review process, noting that School of Design administrators initiated "disciplinary action against her in October 2003, "specifically citing her grievance"[19]; "inexplicably delayed" her fall 2003 teaching assignments; first forced her to teach the fall 2003 Introduction to CAD course and then removed her as instructor of that course; and did not assign her any courses for the summer 2004 term.  (Id.)

A jury construing the facts in the light most favorable to Doucet could reasonably infer a causal connection between many of the allegedly retaliatory actions identified by Doucet and Doucet's allegations of national-origin discrimination in her UFGC grievance and earlier responses to various levels of RPT review.  With the exception of the decision not to assign any summer 2004 courses to Doucet,[20] all of these actions took place within a few months of Doucet's September 2003 UFGC grievance filing.  The record indicates that School of Design

---

[19] In its reply brief, UC contended that Korosick's disciplinary action against Doucet cannot be regarded as retaliatory because "the initiation of an investigation that does not lead to discipline does not constitute adverse action" for Title VII purposes.  (Doc. #18 at 9 (citing Johnston v. O'Neill, 130 Fed. Appx. 1 (6th Cir. 2005).)  The Supreme Court has since held that any employer action that is objectively harmful enough that it "could well dissuade a reasonable worker from making or supporting a charge of discrimination" may constitute retaliatory action under Title VII. Burlington Northern & Santa Fe Railroad Co. v. White, 126 S. Ct. 2405 at 2409, 2415 (2006).  The initiation of a formal disciplinary investigation – even one that does not result in formal discipline – would satisfy this standard.

[20] Director Probst announced this decision in May 2004.  See Part I.A.6, supra.

Dean Korosick and other administrators had recently received or been privy to correspondence

in which Doucet alleged that she had been discriminated against in the RPT process or other

administrative matters on account of her national origin.[21]  (See generally Part I.A.5 (describing

in part Doucet's June 2003 letter suggesting that her "nationality" had been a factor in the first

three levels of RPT review), Part I.A.5.b (describing national-origin bias allegations in Doucet's

September 2003 UFGC grievance), and Part I.A.6 (describing national-origin bias allegations in

Doucet's correspondence challenging Fall 2003 teaching assignment).  This contemporaneous

employer knowledge of Doucet's discrimination allegations, combined with the "closeness in

time" between those allegations and UC's ostensibly adverse actions, may support an inference

of causal connection.  Weigel, 302 F.3d at 367 (citing Johnson v. Univ. of Cincinnati, 215 F.3d

561, 582 (6th Cir. 2000).

On balance, therefore, the Court finds that Doucet has established a sufficient "causal

connection" between her allegations of national-origin bias and the above-referenced actions to

---

[21] The correspondence between School of Design Dean Korosick and Doucet is particularly suggestive.  In August 2003, the month before Doucet filed her UFGC grievance, Korosick warned Doucet that she would be forced to pursue discipline if Doucet continued to make what Korosick characterized as "unfounded" "obstructionist" "accusations of unfair treatment."  See discussion and citations at Part I.A.6., supra.  While Korosick's words do not necessarily refer to Doucet's allegations of national-origin bias, as opposed to her more general complaints of unfair treatment, cf., e.g., Weigel, 302 F.3d at 381-83, a reasonable jury construing them in light of subsequent developments could so infer.  Doucet responded to Korosick in late August and early September 2003 by speculating that she was being "punished" for her French citizenship and threatening to "file a grievance" if forced to teach the Introduction to CAD.  See discussion and citations at Part I.A.6., supra.  Several weeks later, on September 25, 2003, Doucet in fact filed a grievance alleging both that she had been forced to take on courses outside her areas of expertise and that she had been subjected to national-origin discrimination in the RPT review process.  See Part I.A.5.b, supra and Doucet Dep. Ex. 40.  In early October 2003, Korosick notified Doucet that formal disciplinary action had been initiated against her.  See discussion and citations at Part I.A.6, supra.

state a *prima facie* retaliation case under Title VII.  For the reasons below, however, the Court

finds that UC is nonetheless entitled to summary judgment on Doucet's retaliation claim.

### b.        Legitimate, Non-Pretextual Reasons for Adverse Actions

UC argues that even if Doucet has made out a *prima facie* retaliation case, her retaliation

claim must fail because UC has offered legitimate reasons for each allegedly retaliatory action

that Doucet cannot rebut as pretextual.  With respect to Korosick's and Zimpher's decisions to

uphold the lower-level RPT reviews rather than remand Doucet's dossier, UC contends "the

determinations by each level of RPT review . . . that Doucet's teaching was unsatisfactory" and

that she failed to demonstrate growth in other areas constituted non-retaliatory, non-pretextual

grounds for non-renewal of Doucet's contract.  (Doc. #10 at 19.)  For the reasons set forth in its

analysis of Doucet's *prima facie* discrimination case at Part II.A, supra, the Court agrees.

The Court also agrees that UC has set forth – and Doucet failed to rebut as pretextual –

legitimate reasons for each allegedly adverse action beyond its non-renewal of Doucet's

contract.  UC submits that Dean Korosick initiated formal disciplinary action against Doucet in

October 2003 "because [Korosick] believed Doucet was not teaching an assigned course as

instructed and was creating a hostile environment for students."  (Doc. #18 at 10 (citing Doucet

Dep. Ex. 62).)  Because it is clear from the record that the "assigned course" in question was the

fall 2003 Introduction to CAD course, UC's submission also provides a legitimate reason for

Korosick's decision to remove Doucet as instructor of that course.  (See discussion and citations

at Part I.A.6, supra.)  With respect to Korosick's initial decision to *assign* Doucet the

Introduction to CAD course despite Doucet's assertions that she was unqualified to teach it, UC

notes that Doucet had taught "a similar CAD class in summer 2002, nearly a year before she

filed her grievance."[22]  (Doc. #18 at 9 (citing Doucet Dep. Ex. 53).)  Moreover, the record

reveals that the summer 2002 CAD course was designed to be more advanced than the fall 2003

Introduction to CAD course – reinforcing the inference that Korosick reasonably believed

Doucet was qualified to teach the latter course and did not intend the assignment to be punitive.

See Part I.A.6 (citing in part doc. #19 Ex. 56).  Finally, with respect to Director Probst's decision

not to assign Doucet any courses for summer 2004, UC notes that "summer [teaching]

assignments are not guaranteed."[23]  (Doc. #18 at 9.)  Doucet has not pointed to – nor does the

Court's own survey of the record reveal – any evidence that raises a genuine dispute of material

fact as to whether these explanations are pretextual.

     In sum, because no reasonable jury construing the facts in the light most favorable to

Doucet could find that UC retaliated against her for alleging that her reappointment review was

tainted by national-origin bias, the Court **GRANTS** summary judgment to UC on the second

count of Doucet's complaint.

## IV.    CONCLUSION

     For the reasons above, Defendant University of Cincinnati's Motion for Summary

Judgment (doc. #10) is **GRANTED** as to both the discrimination and retaliation counts of

---

[22] UC does not explicitly address Doucet's broader suggestion that the administration delayed notifying her of her Introduction to CAD and other fall 2003 teaching assignments for retaliatory reasons.  However, the record includes an email from Korosick to Doucet explaining that Doucet's assignments were delayed in anticipation of decisions regarding a new curriculum.  (See discussion and citations, supra note 10.)  Doucet simply has not set forth any evidence from which a jury could reasonably infer that this explanation was pretextual.

[23] The record also indicates that Doucet was not assigned to teach any courses during the preceding summer of 2003.  See Part I.A.6, supra (citing doc. #19 ex. 82).  This further weakens any inference that the administration denied Doucet the opportunity to teach in summer 2004 in retaliation for her UFGC grievance and other complaints of national-origin bias.

Plaintiff Nathalie Doucet's complaint.  This Order disposes of all motions in this action, which is hereby **CLOSED**.

IT IS SO ORDERED.

    s/Susan J. Dlott            
Susan J. Dlott
United States District Judge

45